# UNITED STATES DISTRICT COURT

for the

Western District of Washington

<table>
<tr><td>FILED</td><td>LODGED</td></tr>
<tr><td></td><td>RECEIVED</td></tr>
<tr><td colspan="2">03/18/2021</td></tr>
<tr><td colspan="2">CLERK U.S. DISTRICT COURT<br>WESTERN DISTRICT OF WASHINGTON AT TACOMA</td></tr>
<tr><td>BY</td><td>DEPUTY</td></tr>
</table>

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)*   )      Case No.      3:21-mj-05062
Residence, Vehicle, and a Person,              )
Described in Attachments A-1 to A-3            )
                                               )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Residence, Vehicle and a Person, more fully described in Attachments A-1 to A-3, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 and 846 | Distribution and Conspiracy to Distribute Controlled Substances |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

✓ See Affidavit of FBI Special Agent Richard Schroff Jr., attached hereto and incorporatated herein by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

RICHARD SCHROFF
Digitally signed by RICHARD SCHROFF
Date: 2021.03.17 14:07:17 -07'00'

*Applicant's signature*

RICHARD C. SCHROFF Jr., Special Agent, FBI

*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:     03/18/2021

*Theresa L Fricke*

*Judge's signature*

City and state:   Tacoma, Washington          THERESA L. FRICKE, United States Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

STATE OF WASHINGTON  )
                              )  ss
COUNTY OF PIERCE       )

       I, Richard C. Schroff Jr., a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, having been duly sworn, state as follows:

### AFFIANT BACKGROUND

       1.     I am a Special Agent (SA) with the FBI and have been employed as a criminal investigator with the FBI since July of 2014.  I am a graduate of the FBI Academy in Quantico, Virginia, and have attended various other trainings such as the U.S. Department of Justice, Asset Forfeiture/Money Laundering Section's Basic Financial Investigation Seminar, the FBI's economic crimes conference, and the FBI's public corruption seminar. I have also received training and have gained experience through my investigations in obtaining and analyzing financial records, communication records, and location records for mobile devices and computers. The FBI is responsible for enforcing federal criminal statutes of the United States. While employed by the FBI, I have investigated violent crime, internet child exploitation, violations involving controlled substances, public corruption and civil rights violations, and other criminal matters which can generally be referred to as white collar crime.  At present, I am primarily assigned to investigate public corruption. I have gained experience through training and everyday work relating to conducting these types of investigations.  I have also regularly applied for and been granted search warrants for both physical locations and electronic records, searched or had others conduct searches, and used evidence found during those search warrants to further my criminal investigations.  As a federal law enforcement officer engaged in enforcing the criminal laws of the United States, I am authorized by the Attorney General to apply for search warrants.

1    2.      The facts in this affidavit come from my personal observations, my training

2  and experience, and information obtained from other agents and witnesses. The

3  investigative team has included the FBI, the Washington Department of Corrections

4  (WADOC), Department of Homeland Security - Office of the Inspector General (DHS-

5  OIG), the United States Customs and Border Protection - Office of Professional

6  Responsibility (USCBP-OPR), and the Olympic Peninsula Narcotics Enforcement Task

7  Force (OPNET). This affidavit is intended to show merely that there is sufficient probable

8  cause for the requested warrant, and therefore does not set forth all of my knowledge about

9  this matter.

10                          **PURPOSE OF AFFIDAVIT**

11    3.      As described herein, there is probable cause to believe that the following

12  offenses have been committed, and are being committed, by MELISSA MESA, and others:

13  distribution of, and possession with intent to distribute, controlled substances (including

14  methamphetamine, liquid THC, and Suboxone[1]), in violation of Title 21, United States

15  Code, Sections 841(a)(1) and 841(b)(1), conspiracy to commit the same offenses, in

16  violation of Title 21, United States Code, Section 846, and money laundering, in violation

17  of Title 18, United States Code, Section 1956.

18    4.      I make this affidavit in support of an application for warrants authorizing

19  searches of the target locations and **vehicle**, which are further described below and in

20  Attachment A, for evidence, fruits and instrumentalities, as further described in Attachment

21  B (attached hereto and incorporated by reference as if fully set forth herein), of violations

22  of the above-listed statutes, as described herein.

23    5.      I am seeking warrants for the following subject location and vehicle within

24  the Western District of Washington, as more fully described herein:

25

26  _____

27  [1] According to drugs.com, Suboxone is a schedule 3 prescription only drug that is used to help treat opioid addiction
and is considered to have moderate abuse potential. (https://www.drugs.com/pro/suboxone.html accessed

28  10/23/2020)

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 2
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.      **Target Location** 25330 62nd Avenue S, Apartment CC207, Kent, Washington.  Hereafter the "**Target Residence**" and fully described in the Attachment A.

b.      **Target Vehicle** – A white Chevrolet Avalanche assigned the Texas License Plate DZR8463.  According to the Texas Department of Motor vehicles, the target vehicle is registered to Francisco P. Mesa at 12135 Landsdown Ridge Way, Humble, Texas 77346. This is a previous known address of MESA, and MESA has been observed driving this vehicle.

c.      **Target Individual** – The person of Melissa M. MESA.  MESA is a former U.S. Customs and Border Protection employee who is currently residing at the Target Location and drives the Target Vehicle.  She is believed to be coordinating and conspiring to import drugs into the Clallam Bay Corrections Center (CBCC), a Washington State Correctional Facility.

6.      For the target location, authority to search extends to all parts of the property, including main structure, garages, storage structures, outbuildings, and curtilage, and all containers, compartments, or safes located on the property, whether locked or not where the items described in Attachment B (lists of items to be seized) could be found.  For the target vehicle, authority to search extends to all parts of the vehicle and any cases, containers, compartments, or safes located in the vehicle, whether locked or not, where the items described in Attachments B (lists of items to be seized) could be found.

7.      I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; When I refer to registration records for vehicle, I am relying on records obtained from the Washington State DOL and/or the Texas Motor Vehicle Department.  Insofar as I have included event times in this affidavit, those event times are approximate.

8.      Since this affidavit is being submitted for the limited purpose of obtaining authority to search the **Target Individual, Target Residence** and **Target Vehicle**, I have not included every fact known concerning this investigation.  I have set forth only the facts that I believe are essential for a fair determination of probable cause that the target subject(s) are involved in drug trafficking, and the **Target Residence** and **Target Vehicle** are being used to facilitate that drug trafficking.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 3
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**SUMMARY OF INVESTIGATION**

2     9.     In May 2020, the FBI initiated an investigation into a conspiracy designed

3 to introduce controlled substances and prescription drugs to inmates incarcerated at the

4 Clallam Bay Corrections Center (CBCC), a Washington State Correctional Facility.

5 Individuals involved in this conspiracy include incarcerated inmates at CBCC, staff

6 members employed by WADOC and assigned to work at CBCC, and other members of the

7 community. In order to carry out the scheme, inmates would arrange for community

8 members to obtain and pay for controlled substances, and then arrange for the substances to

9 be introduced into CBCC by staff members. When WADOC's investigation revealed that

10 MELISSA MESA[2], a former United States Customs and Border Protection Officer, was a

11 community member involved in that conspiracy, they contacted the FBI requesting

12 partnership in the investigation.

13     10.     WADOC Investigator Conrad Artis initiated the case and was the primary

14 investigator for WADOC. He has a limited law enforcement commission for the State of

15 Washington and has experience investigating a range of criminal activity within

16 WADOC's system, including the introduction and sale of illegal substances, illicit financial

17 transactions in support of that introduction and sale, the exploitation of communications

18 between inmates and between inmates and community members, and the investigation of

19 staff members who have become "compromised" and participate in criminal conspiracies.

20     11.     WADOC Investigators became aware of this conspiracy in the spring of

21 2020 through reporting from confidential sources and a review of recorded jail calls and

22 other electronic communications made to and from CBCC inmates. They discovered that

23 Clallam Bay inmate Say KEODARA was in a romantic relationship with Melissa MESA.

24 According to WADOC records, KEODARA is incarcerated for one count of first-degree

25 murder, three counts of first-degree assault, two "other" assault charges, and one count of

26

27 ───────────────

[2] MESA's employment with United States Customs and Border Protection was terminated in or around December of
28 2020 for misconduct not related to this investigation.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 4
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

second-degree burglary. His estimated release date is October 2, 2054.  During their relationship, KEODARA asked MESA to meet with individuals in the community in order to obtain illegal drugs and illegally obtained prescription drugs for the purpose of passing the drugs to others for introduction into CBCC. KEODARA also asked MESA to conduct financial transactions on his behalf in furtherance of the drug conspiracy. WADOC investigators learned of these transactions by reviewing a significant number of recorded phone calls and online messages, videos, and pictures. This affidavit summarizes some, but not all, of the information obtained from those communications to outline not only MESA's involvement as an actor in the conspiracy, but also her knowledge that the contraband she obtained was done so in violation of the law.

Actors in the conspiracy

12.     This section outlines several members of the conspiracy that is within the scope of this investigation, their relationships with one another, and their relationships with other community members. The relationship with other community members is offered the help show the context for phone calls, emails, or financial transaction which are described in this affidavit. The relationships are outlined as follows:

a.     Say KEODARA and Melissa MESA were in a romantic relationship. Between May 1, 2020 and August 18, 2020, KEODARA and MESA had 505 recorded jail phone calls using a phone assigned the number 214-XXX-6862 (**TT1**)[3] and nine calls using a phone assigned the number 360-XXX-8988 (**TT2**). The Government is in possession of many of these recorded calls. In them, MESA and KEODARA discuss their relationship, financial transactions, and what investigators believe are drug transactions. In addition, they had a significant number of other written communications or video visits using the J-Pay system[4].  MESA's son was previously incarcerated at CBCC with KEODARA and

---

[3] On January 15, 2021, I served search warrants issued by U.S. Magistrate Judge J Richard Creatura for subscriber records, call detail records, and historical cell site records on Verizon for accounts associated with TT1, TT2, TT3, TT4, TT6, and TT7 (see below for description of TT7) and on T-Mobile for accounts associated with TT5.
[4] J-Pay is a private entity which offers services to many different corrections agencies in several U.S. states. Their services include money transfer, email, videos, tablets, music, education, and parole and probation payments.

1   KEODARA appears to have deliberately initiated a relationship with MESA by sending
2   her emails through the J-Pay system from her computer or mobile device to a tablet that
3   KEODARA was assigned and had access to in his cell. Investigators know KEODARA
4   goes by the nickname "Peebee" or "PB" and "Sy" and KEODORA refers to MESA as his
5   "auntie," "wife," or "girlfriend."

6           b.      KEODARA had a relationship with a community member referred
7   to as A.M. Investigators believe A.M. has a long history with KEODARA and is or was
8   affiliated with the "Rolling 60's Crips" street gang. Between May 1, 2020 and August 18,
9   2020, KEODARA and A.M. had 69 recorded jail phone calls. A.M. used the phone number
10  (253) XXX-5404 (**TT3**). On their calls, they discuss financial transactions and what
11  investigators believe to be drug transactions. I located criminal history for a person whom I
12  believe to be A.M. and found that they had several criminal convictions including for theft,
13  assault, and unlawful possession of a firearm and arrests for controlled substance violations
14  that were either not charged or were dismissed.

15          c.      KEODARA had a historical relationship with a community member
16  referred to as J.S.  That relationship became romantic during the summer of 2020. Between
17  May 1, 2020 and August 18, 2020, KEODARA and J.S. had 54 recorded jail phone calls
18  and a significant number of J-Pay email communication. J.S. appears to be A.M.'s sister.
19  J.S. used the phone number (253) XXX-4366 (hereinafter, **TT4**) in her communications
20  with KEODARA. On their calls and in their emails, they discuss financial transactions and
21  what investigators believe to drug transactions. I located criminal history for a person
22  whom I believe to be J.S. and found that they had convictions in the State of California for
23  conspiracy and theft and other arrests or citations for obstruction of a public officer and
24  vehicle violations.

25          d.      KEODARA had a personal relationship with a community member
26  referred to as D.N., who was released from CBCC in or around 2019, and was known to
27  use the nickname, "Shanky."  Between May 1, 2020 and August 18, 2020, KEODARA and
28  D.N. had 11 recorded jail phone calls. D.N. used the phone number (206) XXX-9070

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 6
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(hereinafter, TT5). On their calls, they discuss financial transactions and what investigators believe to be drug transactions. I located criminal history for a person whom I believe to be D.N. and found that they had several criminal convictions including for possession with intent to deliver controlled substances in King County Superior Court.

      e.     CBCC offender J.M. had a personal relationship with a community member referred to as S.M.  J.M. had a relationship with KEODARA and CBCC offender J.H. while incarcerated at CBCC.  Between May 1, 2020 and August 18, 2020, J.M. and S.M. had 27 recorded jail phone calls. S.M. used the phone number (206) XXX-6572 (hereinafter, **TT6**). On their calls, they discuss financial transactions and what investigators believe to drug transactions. I located criminal history for a person whom I believe to be S.M.. and found that they had several criminal convictions including for possession with intent to deliver methamphetamine and possession of a firearm in furtherance of a drug crime in U.S. District Court for the Western District of Washington.

      f.     On September 1, 2019, Melissa MESA was arrested by the Fife, Washington Police Department (FPD) for assault and making false statements to a law enforcement officer. During the incident, FPD responded to a domestic violence call and found MESA in her apartment dressed in her CBP uniform and armed. Also present was her boyfriend, whom she said she had been dating for several years. The officers believed the apartment to be MESA's based on her statement that it was and because her belongings, including her CBP uniforms, were located in the master bedroom. During interview, the officers believed MESA to be evasive and believed she lied to them by saying that she had not called 911, when in fact a female had called 911 from her phone number. The officers placed her under arrest and began taking custody of her firearms as required by Washington State law. MESA refused to give them consent to search for firearms and the officers obtained a search warrant for them. During their search for firearms, the officers discovered glass pipes with a white residue and burns marks on them inside of a case located in a green bag next to a sofa in the living room of the apartment. Based on the locating officer's experience, he believed the residue to be methamphetamine.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 7
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## PROBABLE CAUSE FOR SEARCH WARRANT

2

### *Use of Mobile Devices:*

3        13.     During their review of phone calls, WADOC learned that the primary
4   phone number MESA used to communicate with KEODARA was TT1. They later learned
5   that MESA obtained TT2. The FBI obtained records pursuant to a subpoena and confirmed
6   that MESA was the subscriber for TT1 and that TT2 was a prepaid phone assigned to
7   "Syke Sixteen".

8        14.     On January 15, 2021, I served search warrants issued by U.S. Magistrate
9   Judge J Richard Creatura for subscriber records, call detail records, and historical cell site
10  records on Verizon for accounts associated with TT1, TT2, TT3, TT4, TT6, and TT7 (see
11  below for description of TT7) and on T-Mobile for accounts associated with TT5. Verizon
12  returned records to me on January 21, 2021 and T-Mobile provided records on March 16,
13  2021, though they have not yet been analyzed..

14       15.     The records provided by Verizon indicate that TT1 is a postpaid account,
15  has MESA as the subscriber, and the **Target Residence** as the address of record. TT1 is
16  listed as an iPhone 7 assigned the International Mobile Equipment Identifier (IMEI) as
17  359171076957030. TT2 is a prepaid account, has "Syke Sixteen" as the subscriber with a
18  "GENERAL DELIVERY" address in Sequim, WA as the address of record, an effective
19  date of June 12, 2020, and no listed disconnect date. TT2 is listed as a ZTE Blade Vantage
20  2 phone assigned the IMEI 869942042471675.

21       16.     An initial analysis of the call detail records indicates that TT1 had
22  numerous phone calls to a number assigned to WADOC, four to TT2, and one to TT4. It
23  also found that TT1 had one text message to TT2, 47 to TT3, and four to TT4.

24       17.     KEODARA called TT1 68 times between February 1, 2021 and March 7,
25  2021. The last phone call between KEODARA and TT2 was in July of 2020.

26       18.     On March 8, 2021, I conducted a ruse telephone call to TT1 in order to
27  establish that MESA was continuing to use her phone(s). On the second attempted call I
28  heard what I believe was a female voice answer the phone and say, "Centers for Disease

1  Control," or something near to those words. In a review of emails sent between MESA and

2  KEODARA via J-Pay, I reviewed an email sent from MESA to KEODARA where she is

3  discussing if someone had called. She wrote, "Love, when I answer the phone I actually

4  answer, 'Center of Disease control goes can I help you' Honest lol. If it's a telemarketer

5  they hang up."

6  ### *Use of Cash App*

7       19.    In his review of recorded jail calls, Investigator Artis overheard several

8  references to use of the payment platform Cash App. Cash App is a mobile application

9  owned by Square Inc. that allows users to make financial transactions such as sending and

10 receiving money or purchasing Bitcoin and stocks. To open an account, Cash App may

11 require a user to submit their name, email address, text-enabled mobile phone number,

12 street address, zip code, date of birth, social security number, and a government issued

13 form of identification. Once an account is established, users choose a unique username

14 referred to as a "Cashtag." Cash App is made for use on mobile devices. In their normal

15 course of business, Cash App maintains records about both financial transactions and

16 transactions associated with using their service, such as Internet Protocol Address

17 information.

18      20.    Investigator Artis heard KEODARA and others discuss Cashtags or other

19 information which identified specific Cash App users to which money should be sent. In

20 his review, he heard MESA be associated with the Cash Tags $1yingyang777 and

21 $psykeo610 and TT2 be given as a number to send money to on Cash App; A.M. be

22 associated with the Cash Tag $Antmos60, $Crip60, and $Antoinemosley60; and J.S. be

23 associated with the Cash Tag $Cr1p60.

24      21.    In the course of the investigation, Grand Jury subpoenas were issued for

25 these and other accounts. Cash App has not responded to all of the subpoenas as of this

26 writing, though on February 22, 2021 they provided records for 5 of the accounts including

27 $antmos60 and $antoinemosley60 which were both assigned to A.M. and associated with

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 TT3; $crip60, which was associated with a bank account and email address but had no

2 transactions of subscriber listed; and $cr1p60 which was associated with J.S. and TT4.

3    22.    Cash App did not respond to or provide records with the Cash Tags

4 believed to be associated with MESA, however based on the other records provided, I

5 believe MESA to be associated with the sender/receiver name "Mo Money" based on the

6 following communications and Cash App transactions, as well as its association with

7 MESA's banking records, as discussed later in this affidavit. Below are examples of

8 transactions indicating MESA's use of "Mo Money."

9        a.    On June 14, 2020, a CBCC Offender "J.G.," whom WADOC knows

10 to use the nickname "XO," provided a community member referred to as "M" with TT2

11 and told her to send MESA $500 via Cash App.

12        b.    On June 14, 2020, KEODARA and A.M. discuss money transactions

13 and A.M. provides the Cash App username, "$Antoinemosley60." They discuss getting

14 the $500 mentioned in the phone call between J.G. and M to KEODARA's auntie.

15        c.    On June 15, 2020, a Cash App user with the name "XOs Wife" sent

16 $500 to A.M. Seven minutes later, A.M. sent $500 to Cash App "Mo Money" with a note,

17 "sy" provided with the payment.

18        d.    On June 17, 2020, KEODARA and A.M. discuss sending

19 KEODARA's auntie $1800. There are three Cash App transactions occurring on June 18th,

20 22nd, and 23rd of 2020 where Cash App user A.M. sent a total of $1,200 to Cash App user

21 Mo Money.

22    23.    Between May 3, 2020 and July 18, 2020, A.M. paid "Mo Money"

23 $4,405.00 and "Mo Money" paid A.M. $1,000.  J.S. received $9,003.00 from "Mo Money"

24 and did not send any money to "Mo Money".

25 **_MESA's Bank Account_**

26    24.    On February 19, 2021, pursuant to a Grand Jury subpoena, the investigative

27 team obtained financial records from JP Morgan Chase and Company for MESA's bank

28 account ending in 1692 for activity between December 19, 2019 and January 21, 2021.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 10
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  This account is where MESA received at least part of her direct deposits from her
2  employment with the Department of Homeland Security. This account made a number of
3  payments to J-Pay and the WADOC phone system. For the covered time period the records
4  show cash withdrawals of $37,879 and cash deposits of $25,660 while the posted income
5  from salary was $32,105.86. The vast majority of these cash transactions occur between
6  June of 2020 and January 2021. This activity was mostly supported by $39,110.89 in
7  withdrawals from MESA's Federal retirement savings account. This account was linked
8  with at least one Cash App account, including one associated with "Mo Money" and sent
9  $3,110.00 to "MO Money" between June 29, 2020 and October 31, 2020, $400 to J.S. on
10  July 18, 2020, and received total credits from Cash App in the amount of $640.25 in two
11  payments occurring on July 4, 2020 and on August 18, 2020.

12  ***Arrest and Interview of A.C.***

13      25.      On August 18, 2020, WADOC, OPNET and the FBI conducted an
14  operation to interdict A.C., a WADOC corrections officer assigned to CBCC, who was
15  believed to have obtained contraband for introduction into CBCC from J.S. A.C. was
16  known to use the telephone number 360-XXX-0834 (hereinafter, TT7). An initial analysis
17  of Verizon records indicates TT4 and TT7 had 98 text message communications.
18  Investigator Artis and I interviewed A.C., and he provided consent for a search of his
19  vehicle, lunch box, two cell phones, and his person.

20      26.      During the consent search of A.C.'s car, OPNET Detectives discovered a
21  note, which read as follows:

22      "So, I'm ready to rock ASAP. There's no need to worry about anything on this
23      end. Things are quiet over here and we are being sage. I need to stack some
24      chips for an attorney, and I want to make this good for you as well. I have 3
25      racks for you ready to go – and another 2 racks upon delivery. Sweeten the pot
26      for everyone. If you have any issues with size, you can deliver half to me now
27      and half later – this will alleviate any concern you may have about size.
    Remember, you can always see Moses over there if that is easier. I don't want
    to mess with the crystal anymore – its too loud – just the blue packages and the
28

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 11
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

chew – that's it. All you need to do is text "J" at [TT4] and ask how her and husband are doing.

She will get back to you immediately and you guys can figure it out. No worries – we keep our hands clean over here and everyone gets taken care of. We make sure family is first and everyone is eating! (smiley face drawn) And we stay away from the phones – that's always the #1 concern. So, as far as your 2 racks after delivery, you'll have to wait a week before texting "J" back – give me time to transfer more $ her way. She's a sweetheart – will meet you wherever you need to meet. Just understand this should be done ASAP – I need some chew! (smiley face drawn) BTW – there a couple 40's over here who keep updated on things – everything here is good. See you soon. Respects"

27.     Investigators believe "J" to be the same person as J.S. based on the use of TT4, information obtained by reviewing jail calls, and information revealed by A.C. Investigator Artis believes "Moses" to refer to another offender who worked a prison job in the same unit where A.C. was assigned and who also has links to the CBCC offenders discussed in this affidavit.

28.     During the interview, A.C. admitted to having received the note from J.H., who was the cell mate of KEODARA. He described having communicated with a person named "J" using his primary cell phone which was associated with TT7. A.C. said he arranged for "J" to drop something off in the trunk of his car while he was on a trip to Tukwila, WA with his family. When A.C. returned home, he moved the items left by "J" into his other car, a Nissan Altima, so that the items would not be discovered by his family. At the time of this interview, A.C. denied having met with anyone else to obtain contraband. Following the interview, A.C. was arrested by Clallam County Deputies.

29.     OPNET Detectives obtained a Search Warrant for A.C.'s Nissan Altima, which was parked at his residence in Port Angeles, WA. During the execution of that warrant, Detectives found and seized 61 grams (2.15 ounces) of methamphetamine, 215 suboxone strips, suspected liquid THC, and $2,300. The items were found inside a plastic bag inside A.C.'s gym bag in the trunk.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 12
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     During the operation on August 18, 2020, I took two phones from A.C. as evidence, as A.C. admitted to having used them to communicate about contraband introductions. One was the flip phone found in A.C.'s car and the other was his primary cell phone. A.C. gave me his consent to search both phones. I later conducted a consent search the phone that was associated with TT7, A.C.'s primary cell phone. Though no communications were found between TT7 and another other target telephone numbers, there was a contact card stored on the phone for "J" and listing TT4 as the contact number. On September 3, 2020, I conducted a search of the flip phone taken from A.C. During the search, I found only one contact for "Scott" using the phone number TT6. I know Scott to be the same person as S.M. This is the number Investigator Artis found to belong to S.M. and had been in contact with other WADOC offenders. The call log listed several calls between the flip phone and "Scott" on January 28, March 5, and March 14, 2020. There was also a text message thread between the flip phone and "Scott" on May 26 and 27, 2020. The text messages arrange a brief meeting between A.C. and "Scott" where they "do a hand off" at the Bainbridge Island Ferry Terminal and "Scott" immediately turns around and re-boards the ferry returning to Seattle. In the text message exchange, A.C. asks, "is the money on the mango?" to which "Scott" replies, "yep." Prior to the search of both phones, I contacted A.C. and his attorney and ensured that the FBI still had A.C.'s permission to search the phone without a warrant, and ensured that A.C. was able to contact me by telephone while I was searching the phone if he decided to revoke his consent.

31.     In a review of J-Pay emails between J.S. and Keodara, investigators found emails where J.S. and KEODARA are arranging for J.S.'s meeting with A.C. They refer to A.C. as "K" and "cozzin k" and discuss meeting with others prior to the meeting, including "deeno", whom I believe to be D.N. to obtain items such as "a couple zeez of izzo" and to arrange payment for the items. On August 16, 2020, J.S. told Keodara she got everything to "K". In my training and experience I believe "zeez" refers to ounces and "izzo" to refer to a controlled substance.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 13
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

32.     On August 17, 2020, KEODARA emailed MESA using the J-Pay email system, "also,one last question,did my cozzin k or uncle ever txt,kall u,the one that comes around this part of washington." MESA responded by email, "I wouldn't know love. I don't know who your cuzin or uncle are still. AND If they did. I'd tell you before you even asked. Love when I answer the phone I actually answer, 'Center of Disease control goes can I help you' Honest lol. If it's a telemarketer they hang up. But no. No one has called me"

### *Communications about Drugs and Money Transfers*

33.     During the investigation, the FBI obtained copies of records and phone calls from WADOC for communications between MESA and KEODARA. Among the records received from WADOC was Investigator Artis' report of investigation. In his report, Investigator Artis provided summaries of those calls. He noted where, based on his training and experience and from what he heard on the calls, he believed KEODARA, MESA, and others discussed drugs, exchanges of drugs, and financial transactions related to those exchanges. I have reviewed some of these calls during my investigation. In reviewing the calls, it appears that KEODARA intentionally speaks in vague terms and use code words when he is discussing drugs and financial transactions with MESA, J.S. and others. This manner of speech differs from when they talk about other things, such as their relationships and other matters which do not seem to refer to criminal activity. In the following paragraphs, I describe communications between various individuals. Except where specifically indicated with quotation marks, the descriptions are summaries of the conversations and are not intended to present a verbatim recitation of the words used by the participants. I know through training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, that individuals involved in the distribution of controlled substances and other criminal activity often use vague references and/or code words and phrases when discussing illegal activity. When such words are used in the investigation, I have used this training and experience, as well as the

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 14
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  training and experience of other law enforcement officers familiar with this investigation,
2  to include what I believe to be an accurate translation of these code words and phrases.
3      34.    The following paragraphs include several examples of observations from
4  jail calls made by both Investigator Artis and myself.  The calls summarized here take
5  place between May 1, 2020 and August 18, 2020, though they do not include a summary of
6  all calls that occur during that time period. Also included among the summary are
7  explanations of some financial transactions involving the mobile payment platform Cash
8  App.
9          a.      In early May of 2020, KEODARA and D.N.  discuss suboxone strips
10  and their being ready to provide to KEODARA's Auntie. Following that exchange, MESA
11  and KEODARA discuss a meeting with Shay, referred to as "his brother" and use
12  "groceries" as their code word for the suspected drugs that she was to exchange with Shay.
13  There is also a conversation between KEODARA and A.M. where they discuss sending
14  $900 to KEODARA's "auntie" via Cash App. On May 3, 2020, Cash App user A.M. paid
15  user "Mo Money" $900 with the note "sy". On May 19, 2020, KEODARA gave A.M. TT 1
16  and asked if he had texted her.
17          b.      On May 21, 2020, KEODARA appears to ask MESA to be the one
18  who handles his money and drug operations. During the conversation, KEODARA asks,
19  "Are you ok with holding everything from here on out?" MESA then asks, "What risk?" to
20  which KEODARA replied, "Me letting you hold everything." MESA then stated, "You
21  don't have to, that's up to you."
22          c.      Between June 28 and June 30, 2020, KEODARA and MESA have a
23  series of phone calls where they discuss what appears to be drug business. In these
24  discussions, they talk about contacting and meeting with a person named "Pedro" and
25  "Shay."  They also discuss money transactions and the use of Cash App. Of note, during
26  these phone calls MESA and KEODARA are arguing about their relationship. During the
27  calls, she states, "I risked my fucking ass for your ass," and "How much did I fucking carry
28  around…of that bullshit…how much huh? Enough to put me how long away?" She later

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 15
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    states, "You have your fucking money," And "Call your people, they have your fucking

2    shit," and "Call your people, I sent it the way it came." KEODARA asks her if she gave

3    them the phone number as well. Later, MESA says, "You know I jeopardized my career,

4    my livelihood, my life for you, for this bullshit..."

5         d.      Between July 27 and August 15, 2020, KEODARA and J.S. have a

6    number of phone conversations during which they discuss drug and financial transactions.

7    During those phone calls, they talk about obtaining suboxone strips from "Dino," who

8    investigator Artis understands to be D.N., and liquid marijuana from A.M.  They further

9    discuss in detail obtaining chewing tobacco, methamphetamine, liquid Marijuana, and J.S.

10   paying "Cousin K" $3,000. KEODARA also passed TT1 to J.S. and asked her to contact

11   MESA to learn about Suboxone Strips and how to package them. On August 10, 2020,

12   KEODARA and D.N. had a phone discussion about providing 50 suboxone strips to J.S. at

13   a cost of $7 per strip.

14        e.      Based on the above, I believe that MESA had continuing knowledge

15   and involvement in the assembling of the drug package for introduction to CBCC. This is

16   based on her communications with J.S., her financial transactions with J.S. and A.M., and

17   several emails between KEODARA and J.S. and KEODARA and MESA. In one email

18   KEODARA told J.S. he was concerned about MESA because she knew too much about his

19   plans for the contraband introduction. In another from KEODARA to MESA, he tells her

20   about J.S.'s success in passing the package off to A.C.

21   *Mesa's Residency and Possession of TT1 And TT2*

22        35.     I conducted a search of a subscription database that maintains records of a

23   wide variety of information about individuals which is mostly aggregated from their

24   creditors and derived from information aggregated in their credit reports, though there are a

25   number of other potential sources of that information. That site listed the **Target**

26   **Residence** as one of MESA's addresses as early as August 1, 2020 and as recently as

27   November 16, 2020.

28

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 16
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

36.     On March 8, 2021, I served a subpoena on the property manager of the **Target Residence**. Their records showed that there was an active lease in the names of Melissa MESA and Kenneth Mesa, which was signed on July 28, 2020.  I believe Kenneth Mesa to be MESA's son and the cosigner on the apartment as the manager told me that MESA did not qualify to rent on her own. MESA's name is also on the billing statement for the **Target Residence**, TT1 is listed as the contact number, and there is no move out date.

37.     On March 8, 2021, myself and other Agents conduct surveillance in the vicinity of the **Target Residence**. A white Chevrolet Avalanche pickup truck with the Texas license plate DZR 8643 was observed parked near CC207. A check of registration information revealed that the truck was registered to Francisco Mesa at 12135 Landsdown Ridge Way, Humble, Texas.  This is a previously known address of MESA.  There was also a clown or other doll face visible in the windshield. The manager of the building said that MESA was driving that vehicle and he remembered the clown face.

38.     From my training and experience, people keep their mobile device(s) on or near their body at almost all times. It is routine that individuals carry their device(s) with them when they leave the house for work or social activities, carry it with them in their car, and otherwise keep it on or near them at all times, including when they are in the restroom or sleeping. Therefore, given MESA's frequent use of her device(s), it is reasonable to believe that she will have them with her or maintain them nearby in her apartment, on her person, or in her vehicle.

39.     From my training and experience, it is also typical for people to own and use multiple electronic devices for the same activities. For example, in the proximate case I believe it would be likely that MESA would use TT1 as well one or more other devices such as a tablet or laptop computer, to send KEODARA email messages using the J-Pay system, conduct financial transactions, maintain records, or other transactions of communication in furtherance of their conspiracy.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 17
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

40.     Based upon conversations I have had with other agents, my knowledge and experience of drug trafficking behavior, and my knowledge of this case, I believe MESA has used her residences to store controlled substances and other instrumentalities such as packaging material, material to facilitate the introduction of contraband, communication devices, and other items as further discussed below.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

Based on my training and experience, and my discussions with other experienced officers and agents involved in drug and money laundering investigations, I know the following:

a.     During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings that show ownership, dominion, and control of vehicles, residences, and/or storage units.

b.     It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles, residences, and/or storage units for their ready access and to conceal them from law enforcement.

c.     Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Narcotics traffickers commonly "front," that is, provide on consignment, controlled substances to their clients. These books, records, receipts, notes, and ledgers, commonly known as "pay and owe sheets," are maintained where traffickers have ready access to them.

d.     Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes and vehicles. Sometimes,

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 18
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    these locations are not their primary residence, but instead used for the purposes of storing

2    and distributing drugs.

3    　　　　　e.　　　Traffickers of controlled substances commonly maintain records

4    reflecting names or nicknames, addresses, vehicles, and/or telephone numbers of their

5    suppliers, customers and associates in the trafficking organization.  Traffickers commonly

6    maintain this information in books or papers as well as in cellular telephones and other

7    electronic devices.  Traffickers often maintain cellular telephones for ready access to their

8    clientele and to maintain their ongoing narcotics business.  Traffickers frequently change

9    their cellular telephone numbers to avoid detection by law enforcement, and it is common

10   for traffickers to use more than one cellular telephone at any one time.

11   　　　　　f.　　　Traffickers maintain evidence of their criminal activity at locations

12   that are convenient to them, including their residences and vehicles.  This evidence often

13   includes more than contraband and paraphernalia and includes financial records, records of

14   property and vehicle ownership, records of property rented, records of storage facilities

15   used to hide drugs or currency, and other documentary evidence relating to commission of,

16   and proceeds from, their crimes.  Narcotics traffickers sometimes take or cause to be taken

17   photographs and/or video recordings of themselves, their associates, their property, and

18   their illegal product, or have photo or video security systems that record images from their

19   homes or property.  These individuals usually maintain these photographs and recordings

20   in their possession or at their premises, in a safe place.  Such evidence may be kept at a

21   safe location for a long time after the drug deal(s) to which they pertain are completed if

22   the location remains under the control of the trafficker.

23   　　　　　g.　　　Traffickers frequently maintain items necessary for weighing,

24   packaging and cutting drugs for distribution.  This paraphernalia often includes, but is not

25   limited to, scales, plastic bags and other packaging materials, sifters, containers, and

26   cutting/diluting agents and items to mask the odor of narcotics.  Persons trafficking and

27   using controlled substances frequently sell more than one type of controlled substance at

28   any one time.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 19
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       h.     It is common for drug dealers to also be users of their product, and it

2 is common for drug users to maintain paraphernalia associated with the use of controlled

3 substances, such as syringes, pipes, spoons, containers, straws, and razor blades.

4       i.     Traffickers frequently maintain records, books, notes, ledgers, travel

5 documents, and other papers relating to the transportation and distribution of controlled

6 substances in locations convenient to them, such as their residences and vehicles.

7       j. Traffickers often maintain weapons, including firearms and ammunition, in

8 secure locations such as their residences and vehicles, in order to protect their drugs and

9 drug proceeds.

10       k.     Traffickers often have false identification documents and

11 identification documents in the names of others.  Traffickers very often place assets in

12 names other than their own, or use fictitious names and identification, to avoid detection of

13 these assets by government agencies, while continuing to use these assets and exercise

14 dominion and control over them.

15       l.     Drug trafficking is a cash business, often involving large amounts of

16 cash at any one time, so drug traffickers often have money counters.

17       m.     Persons involved in drug trafficking conceal in their residences

18 caches of drugs, large amounts of currency, financial instructions, precious metals, jewelry,

19 and other items of value and/or proceeds of drug transactions as well as evidence of

20 financial transactions relating to obtaining, transferring, secreting, or the spending of large

21 sums of money made from engaging in narcotics trafficking activities.

22       n.     Unexplained wealth is probative evidence of crimes motivated by

23 greed, in particular, trafficking in controlled substances.

24       o.     Illegal drug trafficking is a continuing activity over months and even

25 years.  Illegal drug traffickers will repeatedly obtain and distribute controlled substances on

26 a somewhat regular basis, much as any distributor of a legitimate commodity would

27 purchase stock for sale, and, similarly, drug traffickers will have an "inventory," which

28 fluctuates in size depending upon various factors, including the demand and supply for the

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 20
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

product. I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money. These records are often created in code.

41.     Drug trafficking is a cash business, and in order to escape notice from authorities for using unexplained income, or hide excessive cash from illegal activities, traffickers either keep large quantities of cash at home or other secure locations, such as safe deposit boxes, or convert the cash into other valuable assets, such as jewelry, precious metals, monetary instruments, or other negotiable forms of wealth. Records of such conversions are often stored where a trafficker lives or in other secure locations such as safe deposit boxes.

(a)     Money launderers often have banking records to include but not limited to, deposit or withdrawal slips, bank statements, checks, or money orders. Some of these banking records may not be in their own name. Money launderers often have several accounts documented in some form, or instructions detailing how to handle each respective account. For example, they may have a list of accounts belonging to several different people with instructions for how much to deposit or withdraw from each and often maintain this information for long periods of time in their residences or safe deposit boxes.

(b)     Money launderers often have records or evidence related to how the proceeds were spent or concealed and often maintain this information for long periods of time in their residences or safe deposit boxes. Evidence may include jewelry and/or vehicles, as well as the contents of storage lockers, safe deposit boxes or bank accounts.

(c)     The use of bank accounts is a common money movement technique used by drug traffickers to receive payment for narcotics from customers outside of their geographic region. It is common for a trafficker to use several bank accounts for this purpose simultaneously in an attempt to avoid detection by the financial institutions and/or

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 21
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

law enforcement.  The use of multiple accounts, and the commingling of illicit funds with legitimate funds in particular, is often part of the plan to conceal the illegal activity or may be part of the overall integration mechanism by which the illicit funds are made to appear as part of the legitimate income so that only a small portion of or even none of the funds from an account are seized.

42.     Based on my training and experience, and that of those around me, I also know that drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity, to include laundering their proceeds.  They use them to maintain contact with their suppliers, distributors, and customers.  They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require.  Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs.  Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily.  Since cellular phone use became widespread, every drug dealer I have contacted has used one or more cellular telephones for his or her drug business.  I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business.  These items may be kept for months and months in a safe place controlled by the drug trafficker.  Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes.  This includes the following:

a.     The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 22
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  co-conspirators, to identify other telephones used by the same subscriber or purchased as

2  part of a package, and to confirm if the telephone was contacted by a cooperating source.

3          b.      The stored list of recent received, missed, and sent calls is important

4  evidence.  It identifies telephones recently in contact with the telephone user.  This is

5  valuable information in a drug investigation because it will identify telephones used by

6  other members of the organization, such as suppliers, distributors and customers, and it

7  confirms the date and time of contacts.  If the user is under surveillance, it identifies what

8  number he called during or around the time of a drug transaction or surveilled meeting.

9  Even if a contact involves a telephone user not part of the conspiracy, the information is

10  helpful (and thus is evidence) because it leads to friends and associates of the user who can

11  identify the user, help locate the user, and provide information about the user.  Identifying

12  a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking

13  associates.

14          c.      Stored text messages are important evidence, similar to stored

15  numbers.  Agents can identify both drug associates, and friends of the user who likely have

16  helpful information about the user, his location, and his activities.

17          d.      Drug traffickers increasingly use applications on smart phones that

18  encrypt communications such as WhatsApp, or applications that automatically delete

19  messages, such as Snapchat, in order to avoid law enforcement monitoring or recording of

20  communications regarding drug trafficking and/or money laundering.  Evidence of the use

21  of such applications can be obtained from smart phones, and is evidence of a smart phone

22  user's efforts to avoid law enforcement detection.

23          e.      Photographs on a cellular telephone are evidence because they help

24  identify the user, either through his or her own picture, or through pictures of friends,

25  family, and associates that can identify the user.  Pictures also identify associates likely to

26  be members of the drug trafficking organization.  Some drug dealers photograph groups of

27  associates, sometimes posing with weapons and showing identifiable gang signs.  Also,

28  digital photos often have embedded "geocode" or GPS information embedded in them.

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 23
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Geocode information is typically the longitude and latitude where the photo was taken.
2  Showing where the photo was taken can have evidentiary value.  This location information
3  is helpful because, for example, it can show where coconspirators meet, where they travel,
4  and where assets might be located

5          f.       Stored address records are important evidence because they show the
6  user's close associates and family members, and they contain names and nicknames
7  connected to phone numbers that can be used to identify suspects.

**CONCLUSION**

9          43.      For the reasons set forth above, I respectfully submit there is probable
10  cause to believe that evidence of the crime of Distribution of Controlled Substances and/or
11  Conspiracy to Distribute Controlled Substances, and Money Laundering, as described in
12  Attachment B, will be found on the person of Melissa MESA, in the **Target Residence,**
13  and in the **Target Vehicle**, further described in Attachment A, and ask that a warrant be
14  issued to search the **Target Residence** and **Target Vehicle,** and Melissa MESA's person
15  for said evidence.

RICHARD SCHROFF  Digitally signed by
RICHARD SCHROFF
Date: 2021.03.17
14:08:21 -07'00'

Richard Schroff, Affiant
Special Agent
Federal Bureau of Investigation

21          The above-named agent provided a sworn statement attesting to the truth of the
22  contents of the foregoing affidavit on the 18th day of March 2021.

Theresa L. Fricke

THERESA L. FRICKE
United States Magistrate Judge

AFFIDAVIT OF SPECIAL AGENT SCHROFF - 24
USAO # 2020R00599

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **ATTACHMENT A-1**

### **PROPERTY TO BE SEARCHED**

25330 62nd Avenue S, Apartment CC207, Kent, Washington - Referred to herein as the "**target residence**." The **target residence** is a multi-unit apartment building in a multi-building apartment complex. The **target residence** is located on the second floor of building CC, which is a beige colored building with dark colored trim.

Attachment A-1
USAO # 2020R00599 - 1

1

**ATTACHMENT A-2**

2

**PROPERTY TO BE SEARCHED**

3

4   **White Chevrolet Avalanche assigned Texas License Plate DZR8463 –** Referred to

5   herein as the "**target vehicle**."  The **target vehicle** is a white in color 2007 Chevorlet

6   Avalanche Truck, bearing Texas License Plate DZR8463.  According to the Texas

7   Department of Motor vehicles, the target vehicle is registered to Francisco P. Mesa at

8   12135 Landsdown Ridge Way, Humble, Texas 77346.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A-3

## PROPERTY TO BE SEARCHED

**The person of Melissa M. Mesa, DOB: 11/10/1973 -** Referred to herein as the "**target individual**."



Attachment A-3
USAO # 2020R00599 - 1

**ATTACHMENT B**

**(ITEMS TO BE SEARCHED FOR AND SEIZED)**

This warrant authorizes the government to search for and seize the following items that are evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 (possession and distribution of controlled substances, and conspiracy thereof) and Title 18, United States Code, Section 1956 (money laundering) as described below.

I.   Any controlled substances, including but not limited to marijuana, liquid marijuana, cocaine, crack cocaine, heroin, hashish, methamphetamine, MDMA, methadone, oxycodone, "M30 pills", Oxycontin and fentanyl, and Suboxone strips;

II.   Drug Paraphernalia:  Items used, or likely to be used, to store, process, package, use/consume, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

III.   Drug Transaction Records:  Documents such as ledgers, receipts, notes, invoices, and similar items relating to the acquisition, transportation, and distribution of controlled substances.

IV.   Customer and Supplier Information:  Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items.

V.   Currency and Financial Records:  U.S. Currency, money orders, gift cards and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, and money counters.

VI.   Photographs/Surveillance:  Photographs, video tapes, digital cameras, surveillance cameras and associated hardware/storage devices, and similar items, depicting property occupants, friends and relatives of the property occupants, or suspected growers or buyers or sellers of controlled substances, controlled substances or other contraband, weapons, assets derived from the distribution of controlled substances, and photographs of any documents or other items listed elsewhere in this Attachment.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

VII.  Codes and Passwords:  Evidence of codes used in the distribution of controlled substances, including but not limited to passwords for cell phones and bank accounts.

VIII. Property Records:  Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the past, present or future intended purchase, ownership, rental, income, expenses, or control of the premises, and similar records of other properties.

IX.  Indicia of occupancy, residency, and/or ownership of assets including, but not limited to, utility and telephone bills, canceled envelopes, rental records or payment receipts, leases, mortgage statements, and other documents establishing occupancy.

X.  Evidence of Storage Unit Rental or Access:  rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords or other documents relating to storage units.

XI.  Evidence of Personal Property Ownership:  Registration information, ownership documents, or other evidence of ownership of property including, but not limited to vehicles, vessels, boats, airplanes, jet skis, all-terrain vehicles, RVs, and personal property; evidence of international or domestic travel, hotel/motel stays, and any other evidence of unexplained wealth,

XII.  Individual and business financial books, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, such as:

     a.  Employment records:  paychecks or stubs, lists and accounts of employee payrolls, records of employment tax withholdings and contributions, dividends, stock certificates, and compensation to officers.

     b.  Savings accounts:  statements, ledger cards, deposit tickets, register records, wire transfer records, correspondence, and withdrawal slips.

     c.  Checking accounts:  statements, canceled checks, deposit tickets, credit/debit documents, wire transfer documents, correspondence, and register records.

     d.  Loan Accounts:  financial statements and loan applications for all loans applied for, notes, loan repayment records, and mortgage loan records.

     e.  Collection accounts:  statements and other records.

     f.  Certificates of deposit:  applications, purchase documents, and statements of accounts.

     g.  Credit card accounts:  credit cards, monthly statements, and receipts of use.

ATTACHMENT B
USAO # 2020R00599 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2
          h.       Receipts and records related to gambling wins and losses, or any other contest winnings.

3
          i.       Insurance:  policies, statements, bills, and claim-related documents.

4
          j.       Financial records:  profit and loss statements, financial statements, receipts, balance sheets, accounting work papers, any receipts showing purchases made, both business and personal, receipts showing charitable contributions, and income and expense ledgers.

5

6

7
XIII. All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

8

9

10
XIV. All Western Union, Money Gram, and other money transfer documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash, These documents are to include applications, payment records, money orders, frequent customer cards, etc.

11

12

13

14
XV.  Negotiable instruments, jewelry, precious metals, financial instruments, stored value/prepaid cards, receipts for the purchases and expenditures made on stored value/prepaid cards, and other negotiable instruments.

15

16

17
XVI.  Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

18

19
XVII.  Correspondence, papers, records, and any other items showing employment or lack of employment.

20

21
XVIII.  Telephone books, and/or address books, facsimile machines to include the carbon roll and/or other memory system, any papers reflecting names, addresses, telephone numbers, pager numbers, cellular telephone numbers, facsimile, and/or telex numbers, telephone records and bills relating to co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists. Also, telephone answering devices that record telephone conversations and the tapes therein for messages left for or by co-conspirators for the delivery or purchase of controlled substances or laundering of drug proceeds.

22

23

24

25

26

27
XIX.  Safes and locked storage containers, and the contents thereof which are otherwise described in this document.

28

ATTACHMENT B
USAO # 2020R00599 - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

XX.  Evidence of the identities of and relationships between co-conspirators;

XXI.   Cell Phones: Cellular telephones and other communications devices may be seized, and searched for the following items:

a.      Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.      Stored list of recent received, sent, and missed calls.

c.      Stored contact information;

d.      Stored photographs and videos, addresses, notes, or documents/files of or related to narcotics, currency, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs and videos;

e.      Stored text messages related to the aforementioned crimes of investigation, including Apple iMessages, Blackberry Messenger messages, or other similar messaging services where the data is stored on the telephone;

f.      Stored emails and information/data on apps, including Cash App, Venmo, and other money transfer and payment applications;

g.      Stored voicemails;

h.      Stored web browsing history; and

i.      Other data, documents, records, images, videos, or other items in whatever form, tending to identify the subscriber of the device, the user of the device, the possessor of the device, and/or dominion and control of the device.

This warrant authorizes imaging or otherwise copying all data contained on the cellular telephones. This warrant also authorizes reasonable efforts to overcome any passcode protection of the cellular telephones.

The review of the data on cellular telephones may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, sworn or non-sworn examiners at any location, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement implanting this warrant may deliver a complete copy of the electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970